ALBERT NATHANIAL BAXTER AND CLEO BEATRICE BAXTER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Baxter v. Commissioner
Docket No. 15049-82.
United States Tax Court
T.C. Memo 1985-378; 1985 Tax Ct. Memo LEXIS 253; 50 T.C.M. (CCH) 545; T.C.M. (RIA) 85378; July 29, 1985; Affirmed in part and Reversed in part May 6, 1987 *253 Depreciation: Deductibility: Credits: Investment tax credit: Not-for-profit activity: Wind turbine: Chemical cell. -- Depreciation deductions and an investment tax credit were denied with respect to a taxpayer's purchase (primarily through nonrecourse financing) of a wind turbine and lease of a chemical cell. The taxpayer's primary objective was to obtain tax benefits that would shelter income from other activities from taxation rather than to make a profit. The taxpayer failed to manage the property in a business like fashion and, in fact, was uncertain whether it was even installed in the year at issue. In addition, no income was received from the property and no nonrecourse debt or rental payments were ever made. Charitable contributions: Substantiation: Taxpayer employed by donee organization. -- Cancelled checks and a documented receipt constituted adequate substantiation for charitable contributions claimed with respect to a church that a taxpayer was employed by. Income: Gross income: Constructive receipt: Commissions mailed in one year and received in another: Year of inclusion. -- A cash basis taxpayer who, in 1979, received a check for commissions that was mailed in the *254 last week of 1978 was required to include the commissions in his 1978 gross income. The commissions were taxable in the earlier year under the doctrine of constructive receipt since the taxpayer could have claimed the check in person before it was mailed. Additions to tax: Civil penalties: Negligence or intentional disregard of the rules: Energy tax shelter. -- Liability for the negligence penalty was sustained against a taxpayer who claimed depreciation and an investment tax credit on energy property that was "purchased" or "rented" in order to obtain tax shelter benefits and not to make a profit. Albert Nathanial Baxter and Cleo Beatrice Baxter, pro se, Rancho Palos Verdes, Calif.
Mary Schewatz, for the respondent. GERBER
Memorandum Findings of Fact and Opinion GERBER, Judge: Respondent determined a deficiency in petitioners' Federal income tax for 1978 of $17,007 and an addition to tax under section 6653(a)[1] (negligence) of $1,450. After various concessions by the parties, [2] the issues for consideration are: (1) Whether petitioners engaged in an activity concerning a chemical cell and wind turbine for profit within the meaning of section 183 to be entitled to depreciation and *255 lease expense deductions with respect to the chemical cell. (2) Whether the chemical cell was placed in service in 1978 to entitle petitioners to an investment tax credit. (3) Whether petitioners are entitled to certain charitable contribution deductions. (4) Whether petitioners received income in 1978, as they originally reported on their return, but later claimed they did not receive until 1979. (5) Whether petitioners are liable for the addition to tax under section 6653(a) for negligence or intentional disregard of the rules and regulations. Petitioners resided in Rancho Palos Verdes, California, *256 at the time of filing the petition in this case and filed their 1978 joint income tax return with the Internal Revenue Service Center at Fresno, California. References to petitioner in the singular will be to Albert Nathaniel Baxter. Sometime during 1978, petitioner signed an undated document entitled "Turbine Sales Contract" whereby petitioner purchased a wind turbine for $120,000 from Alternate Energy Corporation of America (AECA). The terms of the contract included a $5,000 down payment with the balance payable in equal monthly installments of $824, which payments petitioner never made. Petitioner did not sign any promissory notes with respect to the purchase price of the wind turbine. The "Turbine Sales Contract" that petitioner signed, however, was, in essence, nonrecourse because the balance was secured by a security interest in the equipment and any unsold goods produced with the electricity, and even though petitioner had an option under the contract to extend the payment period on any balance due AECA, was limited to foreclosing upon the wind turbine and generator. Only after 360 months would any unpaid balance in "excess of 90% of [petitioner's] Net Cash Flow" be due and *257 payable. Petitioner also signed a "Purchaser's Statement" which limited claims against AECA and provided AECA an election to repurchase the wind turbine. On December 20, 1978 and in conjunction with the "Turbine Sales Contract," petitioner signed a "Lease" for a chemical cell. The Lease required a $5,500 down payment and monthly rental payments of $300, which payments petitioner never made. In a document entitled "General Election by Lessor," AECA agreed to transfer the investment tax credit on the chemical cell to petitioner. With respect to the wind turbine and chemical cell, petitioner paid AECA $11,500 with a personal check dated December 20, 1978. Petitioner, however, never examined any of AECA's books or records nor did he check AECA's financial situation prior to signing the "Turbine Sales Contract." Furthermore, petitioner did not know if the wind turbine was shipped to Dalhart, Texas in 1978, nor could petitioner verify that his wind turbine or chemical cell was ever placed in service or installed. Ella Sanderfer, a revenue agent, conducted various audits in Dalhart, Texas from 1973 through 1981, visited Dalhart sometimes four or five times a year, and observed the site *258 on which petitioner's wind turbine and chemical cell was located. Ms. Sanderfer did not see any wind turbines erected in 1978, nor did she ever observe any wind turbines in operation. The wind turbine, in order to operate, required a generator to be connected to it, with electrical lines running from the generator to the chemical cell. However, no generator at petitioner's site was ever installed nor were any electrical lines ever connected to any generator. Petitioner's chemical cell was supposed to manufacture bleach, but no bleach was manufactured in 1978. While petitioner sold other wind turbines on AECA's behalf and received commissions from such sales, petitioner never received any income from his chemical cell nor could he verify that his chemical cell ever produced bleach. Petitioner testified that he was "quite certain that [the chemical cell] was not totally operational." Petitioner did not visit the site of his wind turbine until approximately December 3, 1979, almost a year after he invested in the project. When he visited the site, he observed possible vandalism. Petitioner was not able to identify either his specific wind turbine or chemical cell when he visited the *259 site. Petitioner stated that the wind turbine was destroyed by a storm around March 29, 1979, but petitioner did not file any reports with an insurance company or the police regarding the alleged destruction or damage to his wind turbine, nor did he receive any written reports of such damage. Petitioner stated that he did not file any reports because the property was not insured. John R. Henderson, a meteorologist for the National Weather Service, testified as to a standard weather form entitled "Surface Weather Observations" for Dalhart, Texas, which showed the highest sustained wind speed to be approximately 30 to 40 miles per hour on March 29, 1979, but no rain or thunderstorms were indicated on the report for such date. In a letter dated January 31, 1979, from AECA's secretary-treasurer, petitioner was thanked for his belief in the wind turbine product and program, informed that the wind gyros had been delivered and installed in Dalhart, Texas, and advised of the depreciation deduction, investment tax credit, and energy tax credit pertinent to filing their 1978 income tax return. Both petitioners testified that, at their age, they were interested in generating income and not concerned *260 about tax deductions. Petitioners attached various Schedule C's to their 1978 joint return, including one listing the main business activity as "Energy Liberation." On this Schedule C, petitioners reported a basis of $120,000 in the wind turbine and claimed a $9,043 [3] deduction for depreciation. Petitioners also reported a lease expense of $6,100 on the chemical cell. Additionally, petitioners claimed an investment tax credit on their return of $6,857 [4] for both the wind turbine and chemical cell and an energy tax credit of $12,000 on the wind turbine. Petitioner, at trial, however, admitted that he was not entitled to the investment tax credit or energy tax credit with respect to the wind turbine. *261 Petitioners also claimed $7,357 of charitable contributions to various organizations for which they had receipts, canceled checks, or other written evidence. In his statutory notice of deficiency, respondent disallowed the entire amount for failure to establish such amounts were incurred or deductible. At trial, petitioners offered canceled checks and receipts totaling $9,038 [5] for organizations that respondent does not deny are organizations described in section 170(c), with the exception of "Prakash." Respondent, on brief, concedes that petitioners are entitled to $203.10 in charitable contribution deductions. Petitioner received a Form 1099 MISC for 1978 from Peter J. Vieth [6] showing $19,345 *262 as commissions and fees to nonemployees which petitioner reported on his 1978 return. The $19,345 includes a $13,095 check dated December 30, 1978. After filing his return, petitioner claims that he erroneously included the $13,095 represented by the check in 1978 because he did not receive the check until 1979. Petitioner admitted at trial that he could have personally picked up the check on December 30, 1978. Mr. Vieth mailed the check to petitioner on December 30, 1978, and petitioner received the check after December 31, 1978. Thus, after concessions by the parties either at trial or on brief, the amounts still in dispute include the deductibility of depreciation and the "lease expense" with respect to the chemical cell, the amount (if any) of investment tax credit on the chemical cell, the deductibility of charitable contributions, the $13,095 petitioner claims he incorrectly reported on their 1978 return, and the addition to tax for negligence. We first *263 address the issue of whether petitioners invested in the wind turbine and chemical cell as an activity for profit as defined in section 183. Section 183(a) states the general rule that if an individual engages in an activity, and "* * * if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed * * * except as provided in this section." The test for determining whether an activity is engaged in for profit under section 183 is whether the individual engaged in the activity with an "* * * actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one, but there must be a good faith objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Golanty v. Commissioner,72 T.C. 411, 425-426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Allen v. Commissioner,72 T.C. 28, 33 (1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980). The regulations set out nine relevant factors that bear on this determination. Briefly, *264 these factors include: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b)(1)-(9), Income Tax Regs. No one factor is controlling in making this determination. Sec. 1.183-2(b), Income Tax Regs.; Allen v. Commissioner,supra at 34. Petitioners must show that their primary purpose for investing in the wind turbine and chemical cell was to make a profit. Golanty v. Commissioner,supra at 425; Lemmen v. Commissioner,77 T.C. 1326, 1340 (1981). Petitioners have the burden of proof to show that they had the requisite intention and that respondent's determination that the activities were not engaged in for a profit is incorrect. Welch v. Helvering,290 U.S. 111 (1933); *265 Golanty v. Commissioner,supra at 426; Rule 142(a). The determination of whether the requisite profit objective exists is to be resolved on the basis of all the surrounding facts and circumstances of the case. Sec. 1.183-2(b), Income Tax Regs.; Golanty v. Commissioner,supra at 426. Greater weight is to be given to the objective facts than to the taxpayer's mere statement of his intent. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra at 645. Petitioners maintain that they had a bona fide intention and objective of making a profit from the wind turbine and chemical cell activity. Petitioners primarily contend that because of their advancing age, they were most concerned about generating revenues for their retirement years rather than claiming current tax deductions. Respondent, on the other hand, argues that the alleged purchase of the wind turbine and the lease of the chemical cell was void of economic substance and lacked any profit motive. After a careful review of all evidence in this case, we find that petitioners did not have, as their primary objective, the intent to make a profit. Evaluating the facts of this case in light of the nine elements set forth *266 in the regulations, we are not persuaded by petitioners' assertions that they were concerned about generating income for their retirement years rather than being concerned about claiming current deductions. Petitioners expressed concern about generating retirement income belies their lack of investigation of the "windmill project" or their lack of interest in its construction or destruction. Petitioners "invested" a rather large amount in the project but neither petitioner visited the site nor did they hire anyone to manage it or give them periodic reports. Other than the initial payment of $11,500, petitioners never paid any of the monthly obligations under the contracts. Petitioner only saw a prototype of the wind turbine and relied on what appears to be a form letter from AECA to all "investors." The letter delineated the tax deductions and stated that the wind turbine had been sent to Dalhart, Texas. Petitioners never inquired into whether the wind turbine was ever installed or functioning during the taxable year at issue. In addition, petitioner at trial could not verify that his wind turbine or chemical cell was ever placed in service or installed. Additionally, petitioner *267 failed to maintain adequate books and records or to conduct his "energy liberation" activity in a businesslike manner. Petitioner was not an expert in wind generation and he relied, in "investing" in the project, upon a person without special expertise in the project. Petitioner did not investigate AECA's financial status or their books and records. Furthermore, the record is sparce regarding petitioner's efforts to ensure future income from his energy "investment" but there is an indication that petitioner spent some of his time selling the same type of energy "investments" to other persons. Petitioners realized no income from the "energy liberation" activity but claimed a net loss of $15,143 with respect to the activity. Yet on another Schedule C that petitioners attached to their return that they entitled "Profit or (Loss) from Scrounging," [7] petitioner reported income of $72,860. Thus, in stark contrast to the energy liberation activity, petitioner was most successful in carrying on other income producing activities. Based on the amount of income generated from other activities, we believe that petitioner is an entrepreneur, who has the potential to seek and generate a profit *268 from his labors if profit is his goal. While we do not feel that there were any elements of personal pleasure or recreation involved, all of the facts together convince us that petitioners were not engaged in the wind energization activity for a profit. Despite both petitioners' testimony that they were concerned about generating income for their retirement years, the record reflects that petitioners had a substantial amount of income from other activities and that the deductions claimed were sought to "shelter" that other income from taxation. Petitioners paid $11,500 at the end of the taxable year and claimed $15,143 in deductions and $18,857 in credits. *269 Therefore, due to their eleven day "investment" during the 1978 taxable year, petitioners reduced their tax burden by nearly three times the amount they were out of pocket. It is no wonder that petitioners had little interest in the future of their "investment" or even whether the assets were ever installed or operable. Petitioners' stated intent to invest for retirement income purposes is not supported in the record of this case. To the contrary, the record reflects that petitioners were primarily motivated by the tax deductions and credits claimed. Accordingly, we find for respondent on this issue. Petitioners' right to the investment credit for the chemical cell depends on a showing that the wind energization activity was an activity for profit. Having found that petitioners were primarily motivated by the tax deductions and credits, as opposed to profit, petitioners are not entitled to the investment tax credit for the chemical cell. However, in this regard we note that petitioners argue that the chemical cell was placed in service relying on the letter from AECA that the project was being shipped to Dalhart, Texas. Respondent argues, on the other hand, that the chemical *270 cell was never placed in service within the meaning of sections 1.167(a)-11(e)(1)(i) and 1.46-3(d)(1), Income Tax Regs., because the uncontroverted evidence indicates that electrical lines were never connected from the chemical cell to the generator of the wind turbine. Additionally, petitioner was not able to determine, to the extent that chemical cells existed on the situs, whether any of the cells were the subject of petitioner's agreements with AECA. The regulations that respondent relies upon generally provide that qualifying property is first placed in service when it is "in a condition or state of readiness and availability for a specifically assigned function." Because no evidence was produced that the chemical cell was ever in a condition or state of readiness to produce bleach, its specifically assigned function, we conclude that the chemical cell was never placed in service within the meaning of the regulations. Next we must determine whether petitioners are entitled to charitable contribution deductions. It is well settled that petitioners bear the burden of proving their entitlement to a deduction. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). Respondent argues *271 that petitioners failed to meet their burden of proof because they only supplied canceled checks to, or receipts from, various organizations and did not submit a-- statement from the organization to which the contribution was made indicating whether the organization is a domestic organization, the name and address of the contributor, the amount of the contribution, [and] the date of actual receipt of the contribution. Sec. 1.170A-13(e), Income Tax Regs. Respondent argues that petitioners failed to show that "Prakash" was an organization described in section 170(c) to which a charitable contribution is allowable. We note, however, that Prakash Association USA is listed in Publication 78 (Cumulative List of Organizations described in section 170(c)) for 1978 on page 905. Similarly, because petitioners produced substantiation for the amount of their contributions to Prakash, we allow petitioners to claim such deductions. Respondent next disallows larger deductions, evidenced by canceled checks, to "Rolling Hills Church" while respondent concedes and allows smaller deductions to the same organization. Respondent argues that the larger receipts are not deductible because the organization *272 is petitioner-wife's employer. The gist of respondent's argument is that petitioner-wife was employed by Rolling Hills Covenant Church and that the checks written to that Church are questionable because of the employee-employer relationship. We do not agree with respondent. The documentary evidence petitioners presented, when coupled with their testimony (which we find credible on this issue), is more than adequate to meet their burden of proof. In addition to the canceled checks, the record contains a receipted document from the Church reflecting that petitioners contributed $6,081.50 during the year. Such receipt bears a signature other than that of petitioners. In view of the foregoing, we find that petitioners have provided appropriate substantiation for the charitable contributions they claim [8] and we determine that such amounts are allowable. The next issue concerns an attempt by petitioner to change the reporting of $13,095 in income from 1978 to 1979. Petitioner received commissions from Peter J. Vieth for services petitioner performed in 1978. Petitioner received a Form *273 1099 MISC from Peter J. Vieth for 1978 reflecting that he had paid petitioner $19,345 during that year. The $19,345 includes a $13,095 check dated December 30, 1978. Petitioners originally included the entire amount on their 1978 income tax return but now contend that they should have included the $13,095 represented by such check on their 1979 income tax return. Petitioner maintains that he should have reported it on his 1979 return because that is when he, a cash basis taxpayer, received the check and deposited it into his checking account. It is well settled that any item of gross income must be included in gross income for the taxable year in which it is received, actually or constructively. Secs. 61 and 451; sec. 1.451-1(a), Income Tax Regs. Although income is not actually reduced to a taxpayer's possession, income is constructively received in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during such time. Sec. 1.451-2(a), Income Tax Regs.
In determining whether petitioner constructively received the income represented by the check *274 dated December 30, the general rule is that if a check is mailed before the year's end, but is not received until the next year, it is not taxable until received. But where a taxpayer could have received a check in the year before it was actually delivered by merely appearing in person and claiming it, then the check is constructively received in the year preceding actual receipt. McEuen v. Commissioner,196 F.2d 127, 129-130 (5th Cir. 1952). This is also true where a check is available to a taxpayer, but he delays receipt of it until the next year by requesting the payor to mail the check to him. Kunze v. Commissioner,19 T.C. 29, 32 (1952), affd. per curiam 203 F.2d 957 (2d Cir. 1953). Petitioner testified that he could have picked up the check on December 30. Mr. Vieth, however, mailed the check to petitioner on such date. [9] *275 Thus, by petitioner's own testimony, the check was available to him in 1978 if he wanted to pick it up. Accordingly, we find that the $13,095 was constructively received in 1978. We therefore find for respondent on this issue. Finally, petitioners dispute the imposition of the addition to tax for negligence or intentional disregard of the rules and regulations. Petitioners have the burden of proof on this issue and must present sufficient evidence controverting its applicability. Foster v. Commissioner,80 T.C. 34, 237 (1983) and cases cited therein, affd. in part and vacated in part 756 F.2d 1430 (9th Cir. 1985); Enoch v. Commissioner,57 T.C. 781, 802 (1972); Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). We hold that the facts of this case support a finding that petitioners were negligent or intentionally disregarded the rules and regulations. See Gallagher v. Commissioner,75 T.C. 313, 318 (1980). Accordingly, we sustain respondent's determination as to this issue. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year at issue. All rule references are to the Tax Court's Rules of Practice and Procedure. ↩
2. Because of concessions made by the parties, a Rule 155 computation will be necessary. Petitioners concede they are not entitled to the energy tax credit and the investment tax credit on the wind turbine and also concede they are entitled to less depreciation. Respondent concedes that petitioners are entitled to a $203.10 deduction for charitable contributions.↩
3. The $9,043 deduction results from $5,043 as depreciation using the double declining method and an additional $4,000 first year depreciation. Petitioners conceded at trial, however, that they are only entitled to a depreciation deduction of $7,362. On brief, petitioners concede that they are only entitled to claim $5,426 depreciation on the chemical cell.↩
4. Petitioners computed the investment tax credit on $160,000 consisting of $120,000 for the wind turbine and $40,000 for the chemical cell.↩
5. The canceled checks and receipts submitted by petitioners actually totaled $9,038.10, but petitioners elected to round off to the nearest dollar for purposes of reporting. In addition, petitioners admit that they are not entitled to $115 of deductions originally claimed on their return but they are entitled to $1,596 additional deductions for which they have receipts or cancelled checks. Thus, petitioners are claiming $8,838 ($7,357 - $115 + $1,596) of charitable contribution deductions.↩
6. Form 1099 MISC bears the name of "Peter J. Vieth" while petitioner refers to Mr. Vieth as "Jeff" and a note from Mr. Vieth uses "Jeff Vieth" in its letterhead and is signed "Jeff." These differences do not affect our decision.↩
7. Petitioner, when asked to define scrounging, stated: A I wish I could define it better, but about 10 years ago, Ms. Schewatz, an IRS agent asked me that very question, and for the lack of better terminology, I answered this way: * * * I asked this IRS agent, did you ever see a dog go up to a pail and dump it over, and run around and paw through it, and get some food. And she said, yes. And I said, well, that is scrounging. And so, my kind of business is just a catch of -- catch as catch can -- highly variegated type of activity.↩
8. Petitioners claim they are entitled $8,838 of charitable contribution deductions. See n. 5 supra.↩
9. Petitioner also received a $5,000 check from Mr. Vieth, dated Dec. 21, 1978. The back of both checks ($13,095 and $5,000) reflect that they were being processed in the banking system on Jan. 4, 1979.